## UNITED STATES v. ROTH.

(Third Division.   Fairbanks.   July 21, 1904.)

1. PUBLIC LANDS—LANDS SUBJECT TO ENTRY—NAVIGABLE WATERS—
. LANDS BETWEEN HIGH AND LOW WATER.

Navigable streams in Alaska are public highways, and no portion of the bed or land lying between high and low water mark is subject to entry or sale under the public land laws.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 41.]

2. NAVIGABLE WATERS—TIDE LANDS—TITLE.

The title and dominion of the tide waters and the lands under them and the beds and banks of navigable streams in Alaska are held by the United States in trust for the future states to be erected there.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Navigable Waters, §§ 186, 184, 180.]

3. SAME—HOMESTEAD—POSSESSION.

A homestead entry perfected under the United States land laws, where the land abuts upon the waters of a navigable stream, gives to the qualified entryman the exclusive right to the use and occupation of the shore land between high and low water mark as against a mere trespasser.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Navigable Waters, § 246.]

4. PUBLIC LANDS—HOMESTEAD—POSSESSION.

The possession of a homestead entryman under the public land laws *held* to be coextensive with the boundaries of his land, and to extend over shore lands of navigable waters abutting thereon.

5. TRESPASS—CRIMINAL LAW—PUBLIC LANDS.

A trespasser on shore land between high and low water mark, in front of a homestead entry of public lands in the lawful and actual occupation of the entryman, *held* guilty of trespassing on lands or premises in the lawful occupation of another.

Action against the defendant under section 67, Penal Code of Alaska, for trespassing on lands in the possession of another. The admitted facts in this case show that one C. H. Heine entered Garden Island, opposite the town of Fairbanks, as a home-

2 A.R.—17

stead on May 6, 1904; that it borders on the Chena river, which is admitted to be a navigable stream; that Roth subsequently entered upon that part of the land between high and low water, opposite the town, at the side of the bridge crossing from Cushman street, and built a tent thereon, and occupies the ground. He was notified in writing to depart therefrom; refused; was arrested, and found guilty before the commissioner, fined $20, and appealed to this court. He waives jury trial, admits the facts, but offers as a defense that land lying between high and low water in front of a homestead is no part thereof, and is not in the possession of the homesteader, and that his act is not therefore prohibited by the Code.

L. C. Hess, Asst. Dist. Atty., for the United States.

W. H. Adams and Leroy Tozier, for defendant.

WICKERSHAM, District Judge. Section 67 of the Penal Code provides:

"That if any person other than an officer on lawful business shall go or trespass on any lands or premises in the lawful occupation of another, and shall fail, neglect, or refuse to depart therefrom immediately and remain away until permitted to return upon the verbal or printed or written notice of the owner or person in the lawful possession of said lands or premises, such trespasser shall be deemed guilty of a misdemeanor, and shall be punished" as provided therein.

Was that part of Garden Island which lies between high and low water, along the front of his homestead bordering on the Chena river, in the lawful occupation of the homesteader in virtue of his admitted lawful occupation of the abutting upland? The principles upon which the public right of ownership in such lands is based, as well as those which fix the inception of the right of private right therein, are clearly and fully stated in the leading case of Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331. In relation to such titles in territories the court says:

"And the territories acquired by Congress, whether by deed of cession from the original states, or by treaty with a foreign country, are held with the object, as soon as their population and condition justify it, of being admitted into the Union as states, upon an equal footing with the original states in all respects; and the title and dominion of the tide waters and the lands under them are held by the United States for the benefit of the whole people, and, as this court has often said, in cases above cited, 'in trust for the future states.' Pollard v. Hagan, 44 U. S. (3 How.) 212, 221, 222, 11 L. Ed. 565, 570; Weber v. State Harbor Com'rs, 85 U. S. (18 Wall.) 57, 65, 21 L. Ed. 798, 801; Knight v. United Land Ass'n, 142 U. S. 161, 183, 12 Sup. Ct. 258, 35 L. Ed. 974, 981. The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior or on the coast, above high-water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways, and, being chiefly valuable for the public purposes of commerce, navigation, and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government, but, unless in case of some international duty or public exigency, shall be held by the United States in trust for the future states, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older states in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the state after it shall have become a completely organized community."

And in conclusion the court says:

"Grants by Congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, and do not impair the title and dominion of the future state when created; but leave the question of the use of the shores by the owners of uplands to the sovereign control of each state, subject only to the rights vested by the Constitution in the United States." Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, 349.

In pursuance to this general policy, the Congress of the United States, at the beginning of our national existence, pass-

ed, among others, an act declaring all navigable rivers within the public domain to be public highways: "All navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways." Act May 18, 1796, c. 29, § 9, 1 Stat. 468; Act March 3, 1803, c. 27, § 17, 2 Stat. 235; Rev. St. § 2476, U. S. Comp. St. 1901, p. 1567. And to the very point in question Congress declared the general policy in relation to Alaska in the act of May 14, 1898, c. 299, 30 Stat. 409, U. S. Comp. St. 1901, p. 1412, extending the homestead laws to Alaska, as follows:

"And that nothing herein contained shall be so construed as to authorize entries to be made, or title to be acquired, to the shore of any navigable waters within said district."

That act provides:

"That the homestead land laws of the United States and the rights incident thereto * * * are hereby extended to the District of Alaska, subject to such regulations as may be made by the Secretary of the Interior."

In the regulations issued under the act dated July 11, 1899, the Secretary of the Interior construed the clause forbidding the entry or acquisition of title to the shore of any navigable waters as "meaning land lying between high and low water mark" of any navigable waters within said district. Circular from the General Land Office, July 11, 1899, p. 114. That homestead act was further amended by Congress by the act of March 3, 1903, c. 1002, 32 Stat. 1028 [U. S. Comp. St. Supp. 1905, p. 328], under the provisions of which act the homestead in question was located. This act repeats the injunction against allowing entries to be made or title to be acquired to the shore of any navigable waters in Alaska, and in the special regulations authorized therein to be issued by the Secretary of the Interior, and which were issued and dated April 8, 1903, the Secretary declares:

"The act of 1898, supra, is amended so as to provide that no entry shall be allowed extending more than 160 rods along the shore

of any navigable water, and to provide that no homestead entry shall be allowed for more than 320 acres. In executing surveys for homestead applications, the instructions now prevailing will be followed, and the limit of 160 rods as to frontage will be measured along the meandered line of said frontage. The form of the tract sought to be entered, if upon unsurveyed land, is prescribed in the act as follows: 'If any of the land * * * is unsurveyed, then the land * * * must be in rectangular form, not more than a mile in length, and located upon north and south lines run according to the true meridian.' The above is construed to mean that the boundary lines of each entry must be run in cardinal directions, i. e. true north and south and east and west lines by reference to a true meridian (not magnetic), with the exception of the meander lines on meanderable streams and navigable waters forming a part of the boundary lines of the entry. Thus a frontage meander line and other meander lines which form part of the boundary of a claim will be run according to the directions in the Manual, but other boundary lines will be run in true east and west and north and south directions, thus forming rectangles, except at intersections with meander lines. * * * In other respects the rules previously adopted to govern surveys of claims under the act of May 14, 1898, will continue to be followed by you; of course, taking into consideration the limitations as to area of claims."

In accordance, then, with the general policy of the United States to preserve these lands in trust for the future state, the General Statutes and the special laws of the United States applicable to Alaska, no entry may be made or title acquired to the shore of any navigable waters within the District of Alaska lying between high and low water. It is conceded that the Chena river is a navigable stream (United States v. The Montello, 87 U. S. 430, 22 L. Ed. 391); that the land in controversy lies between high and low water on its shores, and in front of the homestead of the prosecuting witness.

There is no statute of the United States specially applicable to Alaska in relation to, or fixing the riparian rights of an upland homesteader in, shore lands along a navigable river. His rights therein are to be ascertained and determined from those general principles of the common law recognized by the courts

and applied in other similar cases.　Garden Island contains less than 100 acres, and is all embraced with the homestead claim of the prosecuting witness.　He is admitted to be in the lawful occupation and possession of his homestead, and the query is whether he is not also in lawful occupation and possession of the shore lands along its river front.　If so, it is in virtue of his actual occupation and possession of the upland, for he is not shown to have an actual occupation and possession of the shore below high water.

While the title of the upland owner to property abutting on a navigable stream may not extend beyond high-water mark, he has rights there which are now and have always been recognized by the courts.　The Supreme Court of the United States in an early case said in relation to this matter:

"Although such riparian proprietors are limited to the stream, still they also have the same right to construct suitable landings and wharves for the convenience of commerce and navigation as is accorded riparian proprietors bordering on navigable waters affected by the ebb and flow of the tide." St. P. R. R. v. Schurmeier, 74 U. S. 272, 19 L. Ed. 74.

And in another case the same court says:

"But whether the title of the owner of such lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and among these rights are access to the navigable part of the river from the front of his lot, the right to make a landing, wharf, or pier, for his own use or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public, whatever those may be." Yates v. Milwaukee, 77 U. S. 497, 19 L. Ed. 984.

And in this same case:

"This riparian right is property and is valuable, and though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which when once vested the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation."

In a later case the Supreme Court reaffirms the language used in the case of Yates v. Milwaukee, supra, and says:

"The riparian proprietor, in the language of Mr. Justice Miller in Yates v. Milwaukee, 77 U. S. (10 Wall.) 497–504, 19 L. Ed. 984, 986, is one whose land is bounded by a navigable stream; and among the rights he is entitled to as such are 'access to the navigable part of the river from the front of his lot, the right to make a landing, wharf, or pier, for his own use or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public, whatever these may be.' Weber v. Harbor Com'rs, 85 U. S. (18 Wall.) 57, 21 L. Ed. 798." Potomac Steamboat Co. v. Upper Potomac Steamboat Co., 109 U. S. 672, 3 Sup. Ct. 445, 27 L. Ed. 1070.

To the same point are the opinions of the judges in Alaska. In the case of Carroll v. Price (D. C.) 81 Fed. 137, the venerable and learned district judge said, in charging the jury:

"The court therefore charges you that the United States holds paramount title to tide lands in this territory, and, where the right of navigation is not impaired, rights of possession by citizens of the United States to such tide lands will be determined by the same rules of law as govern similar rights on the uplands, and this court will apply to the tide lands the rules that American citizens may occupy, possess, use, and improve the same subject to the paramount right of free navigation, and that the prior possession will determine the prior right until 'future legislation by Congress' to all uplands, or until the ultimate sovereign, whether state or federal, having title to the tide lands, shall otherwise provide in relation thereto." Carroll v. Price (D. C.) 81 Fed. 137; Malony v. Adsit, 175 U. S. 281, 20 Sup. Ct. 115, 44 L. Ed. 163.

See, also, Sutter v. Heckman, 1 Alaska, 81; Heckman v. Sutter, 128 Fed. 393, 63 C. C. A. 135; Martin v. Heckman, 1 Alaska, 165; Lewis v. Johnson, 1 Alaska, 529; Juneau Ferry Co. v. Alaska Steamship Co., 1 Alaska, 533.

Whenever a homestead entry is made by a qualified person upon any part of the public domain subject to the homestead laws, the possession of such claimant is deemed to extend to the bounds of the claim as described in his notice of location, not exceeding the area limited by law, although the actual settlement and improvements are on a small parcel only of the tract.

In such case, where there was at the time no adverse possession, the law construes the possession of the claimant to be co-extensive with the description in the homestead entry, upon the ground that it was his clear intention to assert such possession. The general principle which governs such a case is stated in Ellicot v. Pearl, 10 Pet. (U. S.) 412, 9 L. Ed. 475; Smith v. Gale, 144 U. S. 509, 12 Sup. Ct. 674, 36 L. Ed. 521. Nor is the owner of the upland required to maintain the actual occupation or possession upon the shore lands to preserve his riparian rights therein; these flow from and are incident to the possession of the upland. In this case it is conceded that the homestead claimant was in the actual occupation and possession of a part of the land described in his homestead entry, and no prior adverse possession is alleged or shown by the stipulation. Upon the facts and the law, it must be held that he was also in constructive occupation and possession of the whole of the homestead described in his notice of location, as well as the whole of the shore lands of the Chena river in front thereof. His occupation and possession of the abutting uplands was an occupation and possession of the valuable property which he possessed in the shore lands below high-water mark.

Upon the facts and the authorities, I conclude that, by reason of his lawful occupation and possession of his homestead, including the whole of Garden Island, the claimant was in lawful occupation and possession of all the shore lands along its meandered line; that such shore land is a valuable property, to which he has an inchoate but exclusive right of possession as against all the world except the paramount proprietor—the government of the United States as trustee for the future state —that the defendant was and is a trespasser on such shore lands, and, under the stipulated facts, is guilty of trespassing on lands or premises in the lawful occupation of another. Judgment accordingly.