## PACIFIC COAST CO. v. McCLOSKEY.

(First Division. Juneau. July, 1906.)

No. 443A.

1. NAVIGABLE WATERS (§ 36*)—PUBLIC LANDS—TIDE LANDS.

In Alaska, title in fee cannot be obtained to tide lands, either by priority of possession, by the ownership of the uplands, or by settlement and occupancy of the tide lands themselves. Title is held by the United States for the future state.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 184, 186; Dec. Dig. § 36.*]

2. NAVIGABLE WATERS (§ 39*)—LITTORAL RIGHTS IN TIDE LANDS.

The only littoral right which is recognized on tide lands in Alaska is the right of an upland owner to ingress and egress over the same.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 39.*]

3. NAVIGABLE WATERS (§ 37*)—LOCATING TIDE LANDS—NOTICE.

A location notice, by one who claims the upland and the tide lands fronting thereon, is void so far as it attempts to initiate title in the tide lands.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*]

4. NAVIGABLE WATERS (§ 37*)—TIDE LANDS—PUBLIC LANDS—TOWN-SITE.

Where the townsite trustee of Juneau caused a survey to be extended over tide lands abutting thereon, and the tide lands to be platted into town lots and sold by the trustee, held, the trus-

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

tee acted without authority, and the deed to the tide land conveyed no title.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*]

5. NAVIGABLE WATERS (§ 39*)—PUBLIC LANDS—STREETS—TIDE LANDS —TOWNSITES.

Where the surveyor employed by a townsite trustee so located a street along the dividing line between ordinary high tide line and the upland as to include a portion of each, with the intention of separating the tide lands from the upland owner's property, and thus preventing the latter from claiming littoral rights in the tide lands, *held*, the map so made by the surveyor, approved by the trustee and the Secretary of the Interior, was without authority of law, and in no way divested the then owner of the possessory title from any interest which he had then acquired.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 39.*]

6. NAVIGABLE WATERS (§ 39*)—PUBLIC LANDS—TIDE LANDS.

A trespasser *held* to have no right to go upon tide land in front of the upland owner and erect structures or buildings which interrupt or interfere with the right of the upland owner's access to deep water in front of his upland property, and injunction issued to prevent the trespass.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 39.*]

On May 21, 1905, James McCloskey, with a gang of workmen, entered upon the tide lands in front of blocks O, P, and Q of the city of Juneau, and proceeded to drive piles thereon. This plaintiff, claiming these tide lands by virtue of the ownership of the abutting uplands, immediately instituted this suit to enjoin defendant from the further prosecution of the work begun by him. A temporary restraining order was granted. The issues were joined, and on June 12, 1905, the cause was tried, principally upon affidavits and documentary evidence, though a few witnesses were examined.

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

The testimony in the cause covers almost the entire exist-
ence of Juneau as the habitation of white men.   To summarize
the facts, it appears:

That at and prior to the time of the settlement of Juneau
by the whites a trail ran along the shore of Gastineau Channel
just above the line of ordinary high tide.   That on March 6,
1881, M. W. Murray located a tract of land, about 600 feet
front, abutting on the shores of Gastineau Channel, about
one-eighth of a mile south of the town of Juneau, for build-
ing and wharfing purposes.   That in July, 1881, he construct-
ed at about the center of said strip, and upon the tide lands
abutting thereon, a wharf running out to deep water.   That
from that time to 1894-95, the bulk of the business of Juneau
passed over this wharf and across the intervening territory
of the town of Juneau.   That this business passed along a
wagon road upon the beach below the line of ordinary high
tide.   That the wharf company built a walk from the wharf
to the town across their premises, along the line of the old
trail, for the use of the public when the tide was up.   At the
point where the walk joined the wharf, the tide at times
reached and encroached upon the walk.   In 1892, under the
statutes of the United States, application was made by the
residents of Juneau for a townsite patent.   A trustee was ap-
pointed, the exterior boundaries were surveyed, the townsite
subdivided into blocks, lots, streets, and alleys, the survey
platted, and the plat approved.   Lower Franklin street was
surveyed along the shore line, so that five feet of the upland
were included within the lines of the street; the rest lying
on the tide land.   The town of Juneau was duly incorporated
in 1900.   The street was constructed on pilings in front of
blocks O, P, and Q, across the tide lands.   The Pacific Coast
Company deeded to the city of Juneau a.right of way for a
street across the tide lands in front of O, P, and Q.   The
Pacific Coast Company are the owners of blocks O, P, and Q

under a chain of conveyances from Murray, and by virtue of trustee's deeds to the same premises, to its grantors.

L. P. Shackleford, for plaintiff.

W. E. Crews, for defendant.

GUNNISON, District Judge. This is a suit in equity, involving a right, as between the parties hereto, to occupy certain tide lands of Gastineau Channel in front of blocks O, P, and part of block Q of the Juneau townsite. The plaintiff contends for the right in itself by virtue of certain mesne conveyances of blocks O, P, and Q, which it asserts abut upon the tide lands in question. The defendant's position is, briefly, that no littoral rights exist in Alaska, and that, even if there are such rights, the plaintiff has none in this property, for the reasons, first, these blocks do not abut, the old trail being a public thoroughfare, having cut off any littoral right; second, that the building of a walk by the plaintiff's grantors along the tide line deprived plaintiff's grantors, and consequently the plaintiff, of any such right; third, and more than that, defendant asserts that, when the townsite of Juneau was subdivided, the surveyor, under the instruction of the townsite trustee, laid out lower Franklin street so that its east line ran five feet above the line of ordinary high tide for the very purpose of cutting off any littoral rights that might attach to blocks O, P, and Q; fourth, and that plaintiff, by its own act in deeding to the town of Juneau a strip of land along these blocks for a public street, had forfeited all its littoral rights, and estopped itself from setting up any claim thereto.

These propositions advanced by the defendant we will examine in their order. The arguments by counsel upon the questions involved were comprehensive and learned, greatly aiding the court in its examination of the case. The questions submitted for determination are of much importance to all communities in this territory, involving as they do the littoral

rights of upland holders, under townsite patents, in the tide lands.

Though there have been numerous decisions by Alaskan courts on the subject of tide lands, the precise question litigated here does not seem to have been considered. Under the common law of England, from the seventeenth century down to the present time, it seems to have been a well-settled legal principle that the title to tide lands and to the soil under the sea lay in the sovereign, and that no title existed in individuals or private persons otherwise than by grant from the crown. Quite in keeping with this principle of the common law is another, that a grant of the upland from the crown carries with it no title to the abutting tide land; that is, to no part of the soil below the high-water mark. Lord Hale, in his work De Jure Maris, defines three classes of tides: First, the high spring tides, which are fluxes of the sea at those tides that happen at the two equinoctials; second, the spring tides, which happen twice every month at the full and change of the moon; and, third, the ordinary or neap tides, which happen between the full and change of the moon twice in 24 hours. And he there lays it down as the common-law rule that the rights of the crown and of the public do not include the soil which is overflowed by the high spring tides, or by the second class, which he terms spring tides, but that these rights are bounded by the line to which the ordinary or neap tide reaches. De Jure Maris, c. 6, I, and c. 4, II; Gould on Waters (2d Ed.) pp. 62, 63. The reasons for the growth of this rule of the common law are too patent to require consideration at this time. There gradually developed the principle that, while the king holds these lands in his own right, the public also acquired certain rights in and over navigable waters and the land underneath them, and that the king held these waters and the tide lands in trust for the public. This was the status of the common law at the time of the American

3 A.R.—6

Revolution, and these laws had been applied to the colonies and to the proprietary grants by the English crown of the lands upon this continent. After the Revolution, the rights of the crown to the navigable waters and the soil thereunder, by virtue of the common law, became vested in the several states, and these lands were dealt with by the sovereign states as in their judgment was deemed best. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331. Thus when the states acquired territory, either by conquest or concession, the rules of the common law, inherited by this country, were made to apply; and hence there grew up the law that Congress held the navigable waterways and the soil thereunder to the line of the ordinary high tide in trust for such states as might thereafter be organized from the territory of which they were a part. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; Lowndes v. Huntington, 153 U. S. 19, 14 Sup. Ct. 758, 38 L. Ed. 615. While, under the Constitution of the United States, Congress might have legislated upon the subject and had the power to grant the tide lands to individuals, they have never done so, following the principles of the common law. Shively v. Bowlby, supra, 152 U. S. 48, 14 Sup. Ct. 548, 38 L. Ed. 331.

As in all new communities waterways are the first and the most accessible means of travel, so the land which lies along these waterways, whether inland or by sea, becomes the most valuable, and pioneers first settle upon these lands. Necessarily, upon the seashore they construct wharves and quays reaching out to deep water, this to afford better access from the great public highways to the land, and thus has grown up the principle adopted by the courts of the country that in the interests of trade, foreign and domestic, the holders of upland abutting upon the tide land have a certain right of ingress and egress to and from deep water over the tide lands in front of their upland holdings which may not be obstruct-

ed. But this is merely a right, and not a title, and no one may secure the title to the tide land in fee, but can hold it merely by possessory right. Where the tide land has been cut off from the upland by some act of the government or of the owner of the upland, settlers have gone upon the tide land irrespective of upland owners, and have built thereon, holding them by right of possession only. This right has been recognized by the courts, based upon the priority of the occupancy of the tide lands and the maintenance of the occupancy and use. It may be stated as a general proposition that the common law of England with relation to tide lands applies in the United States and consequently in Alaska; that no title in fee can be obtained to tide lands either by priority of possession, by the ownership of the upland, or by settlement and occupancy upon the tide lands themselves, but that the upland owner has the right of unobstructed and uninterrupted access to and from the tide land to deep water, where the upland holding abuts the tide water.

It is contended in this case by the defendant that there are no littoral rights in Alaska, and hence that plaintiff cannot succeed in its suit. Littoral rights are purely statutory, and in some states by act of the lawmaking power have been established. Shively v. Bowlby, supra, 152 U. S. 40, 14 Sup. Ct. 548, 38 L. Ed. 331; Lowndes v. Huntington, 153 U. S. 30, 14 Sup. Ct. 758, 38 L. Ed. 615; Hinman v. Warren, 6 Or. 411. But, as we have seen, none such exist here, save the right of access to deep water from the upland holdings; and if the plaintiff is the owner of upland which abuts upon the tide water at this point, it has the right of uninterrupted ingress and egress over the tide lands to the deep water. Lewis v. Johnson (D. C.) 76 Fed. 477; Weber v. Harbor Com., 18 Wall. 64, 21 L. Ed. 798. Now, let us examine the title of the plaintiff in blocks O, P, and Q. We have already seen that the plaintiffs or their grantors at the time of the townsite entry

held the same title to blocks O, P, and Q, as did the original locator, M. W. Murray. It is true that by his location notice Murray attempted to appropriate to his use a certain portion of the tide lands to the line of low water. This he might not do. Lowndes v. Huntington, 153 U. S. 19, 14 Sup. Ct. 758, 38 L. Ed. 615; Morris v. U. S., 174 U. S. 236, 19 Sup. Ct. 649, 43 L. Ed. 946; Gould on Waters, 64. This location notice, so far as it purported to fix any title to the tide land itself in Murray, is plainly void; but as to that part of the upland stretching along and above the line of ordinary high tide his location was good, and the various conveyances in the chain of title of the plaintiff to that land conveyed to them Murray's title therein.

The entry to the townsite of Juneau was made by the trustee for the use and benefit of the then holders of the property as their interests then appeared. Murray and his grantees had taken this land with the view to its value as a water frontage and to the right of way to deep water, and had constructed upon a portion of it a wharf, and had used the same and were using it at the time of the entry. Their interests were clear and distinct, and as such the townsite trustee entered upon the tract for their use and benefit, and eventually a survey was made, and the deeds passed from the trustee, not only to the specified lots as appeared by the subdivisional survey, but the deed contained a description by metes and bounds as appeared in the original notice of location by Murray. The trustee, in thus deeding a portion of the tide land, acted without his authority, and, so far as that portion of the deed is concerned, it conveyed no title to the grantees; but, as to the remainder of the tract, the title appears to be in the plaintiff.

If, then, its title to the land is good, it had the right of access therefrom to deep water over the tide lands upon which its property abuts, as did Murray, the original locator, unless by some act of Murray or his successors these rights have been cut off or forfeited, as the defendant contends. The

first contention is that when Murray located the tract there existed along the line of ordinary high tide a trail or footpath used by the natives in passing to and fro, and as such was a public highway, and therefore cut Murray off from the tide land. The evidence shows conclusively that there was such a trail. But was that such a thoroughfare or highway as to cut off the upland holder? I think not. The title to the upland was then in the United States, and the public could not, by passage to and fro over these lands, acquire any rights as against the United States; and, though Murray held merely by possessory right under his location notice, the title was still in the United States, and remained in it until the town-site entry in 1893. So that, however much the public may have used this old trail, it deprived the locator of no right thereto, unless by his own acts he recognized such an act, and therefore forfeited it to the public. It is contended by the defendant that the construction of the walk upon the upland along the line of the high tide and over the old trail was tantamount to a consent to the public use and the forfeiture to the public of this strip for the public highway, that it amounted to a dedication of that piece of ground to the public, and that therefore, having dedicated this strip to the public use, it was no longer a part of their premises, and their land abutted on the public highway, and not upon the line of ordinary high tide, and that thus their right of access to deep water had been cut off by their own act. At the time this walk was built, plaintiff's grantors held the property only under a possessory title, and the fee still remained in the United States. It is probably true that, if by any act of plaintiff's grantors this land had been dedicated to the public, or had been forfeited by them to the public use, they would, upon receiving a patent to the land, have been estopped from disputing what they had already granted or forfeited; but it is clear, under the authorities, that this act of the holders of the land in no way amount-

ed to a dedication or a forfeiture. Irwin v. Dixion, 9 How. 30, 13 L. Ed. 25; Coburn v. San Mateo Co. (C. C.) 75 Fed. 535; Nelson v. Madison, 17 Fed. Cas. 1329 (No. 10,110); Chapman v. School District, Deady, 139, Fed. Cas. No. 2,608; Helena v. Albertose, 8 Mont. 499, 20 Pac. 817. The use was at no time adverse to the holders of the land, and was at all times with their consent. These are the two tests that must be applied before we can say that the public in any way acquired title thereto. Certainly it was not a dedication, for the walk was built for the convenience of the owners of the land and the wharf, as well as for the public, and was constructed in the interests of their business. Thus it is clear, I think, that neither plaintiff nor its grantors by any act with relation to the construction of this walk estopped itself from claiming the right of access because of upland ownership.

Defendant insisted most strongly on the argument that the government itself deprived the plaintiff of any littoral rights, and cut it off from the deep water at the time of the townsite entry, where the surveyor, in making the subdivisional survey, ran the easterly line of Lower Franklin street five feet above the line of ordinary high tide, as he testifies, for the purpose of reserving to the town the rights in the tide lands. So far as I have been able to discover by a careful examination of the books, there is no case exactly in point on this question, though there are many cases upon the subject of the trustee's authority to lay out streets and alleys on the original survey of a townsite. It is beyond dispute that, where men form themselves into a community for the purpose of making their homes and conducting business, there must be public highways in, about, and through the various parts of the town, and that when a trustee lays out, under the laws of the United States, a townsite, he must provide such thoroughfares. But how far he shall go to secure this is a question upon which the courts seem somewhat to differ. The

laws of the United States (section 2387, Rev. St. [U. S. Comp. St. 1901, p. 1457]) provide that the entry shall be made "for the several use and benefit of the occupants thereof according to their respective interests," and it is clear that, where public necessity does not require, the interests of the residents of the town must be observed by the trustee in the surveys made under his direction and in the deeds which he subsequently makes to the parties. The interests of Murray's grantees at the time of the townsite entry were fixed. Under their possessory title, they held to the line of ordinary high tide. Their rights were fixed by long occupancy and use, and their interests were so established that the trustee was acting far beyond his authority when he directed the engineer to run the line so as to cut off the rights of the upland holders to the tide lands. His acts and those of his agents were without the authority of law, and the approval of the plat showing the line of the street to be above the line of high tide, both by himself and by the Secretary of the Interior, in no way divested the then holders of the possessory title from any interest which they had theretofore acquired. Ashby v. Hall, 119 U. S. 526, 7 Sup. Ct. 308, 30 L. Ed. 469; Helena v. Albertose, 8 Mont. 499, 20 Pac. 819; Martin v. Hoff, 7 Ariz. 247, 64 Pac. 447; Pueblo v. Budd, 19 Colo. 579, 36 Pac. 599.

The evidence in the case indicates that the public street actually constructed by the city across the front of blocks O, P, and Q did not extend above the line of the ordinary high tide, but was upon piles below that line upon the tide lands, and the acts of plaintiff in quitclaiming to the city of Juneau a right of way across these tide lands can in no way be construed as a forfeiture of the right thereto. It amounted simply to a consent of the city of Juneau to pass across the tide lands in front of their upland holdings while they should maintain it as a street, and that there would be no objection to the interruption of their access to deep water by the line

of the street; and they specifically provide in the reversion clause of the deed that, in the event that the city should cease to use and maintain the tract as a public street, it should at once revert to the grantors or their assignees. On the other hand, the act of the city of Juneau in accepting from this plaintiff this deed across the tide lands in front of its abutting property was a virtual acknowledgment of plaintiff's right to the tide land as an upland holder. The evidence on the part of the plaintiff discloses a series of actions on its part and the part of its grantees which completely and entirely refutes and contradicts any idea of abandonment or forfeiture of their rights as upland holders. The court is of the opinion that, while the plaintiff has in law no title to the tide lands, that remaining in the United States for the benefit of the future state, it has a right of uninterrupted access thereover to the deep water, and that the defendant had no right or warrant, under the law, to go upon the land for the purpose of the erection of any structure or building which would interrupt or interfere with this right of the plaintiff, that he was therefore wrongfully on the land, and that the plaintiff is entitled to the relief for which it prays in its complaint.

Let an order enter in conformity herewith.