THOMPSON v. PELTON et al.

(Third Division.   Valdez.   April 13, 1912.)

No. 549.

1. MINES AND MINERALS (§ 20*)—MARKING THE BOUNDARIES.

Where it is attempted to locate a placer mining claim partly on the upland and thence across the beach or tide or shore land to the line of low tide, and stakes or monuments cannot be maintained on the line of low tide, stakes and monuments on the back line corners of the claim with a sufficient notice thereon, describing the end lines as running to the line of low tide, were sufficient.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 40–44; Dec. Dig. § 20.*]

2. MINES AND MINERALS (§ 9*)—TIDELANDS—PUBLIC LANDS.

Tide or shore lands between high and low water mark on the sea shore in Alaska cannot be located under the United States mining laws.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 9–13; Dec. Dig. § 9.*]

3. NAVIGABLE WATERS (§§ 36, 39*)—TIDE LANDS—PUBLIC LANDS.

While the owner or locator of lands in Alaska, which border upon navigable or tidal waters, has, under the general law, the right of access to such waters for the purpose of navigation, he can acquire no right or title in the soil below high-water mark, and he can have, therefore, no right of possession upon which he can base an action against an intruder whom he charges with interfering with and obstructing him in the erection and use of a structure upon the shore line below such high-water mark.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 21, 53, 82, 103, 112, 117, 127, 180–200, 239–244; Dec. Dig. §§ 36, 39.*]

This suit is one for the possession of ground alleged to be a portion of certain unpatented placer mining claims, to enjoin

_____

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

defendants from mining it and from diverting water from that part of said claims in which they assert no right other than to take the water to the portion in dispute, and for damages on account of plaintiff's ouster from the disputed area. Setting up location of the claims in 1902, the complaint contains the usual allegations. The answer denies all its material allegations, alleges possession and occupancy under the local usage and custom of miners of certain "beach" mining ground lying between high and low tide at Cape Yakataga, alleging the rightful appropriation of water of Culper creek to the amount of 500 miner's inches; prays for a dismissal of the cause and for damages on account of a temporary injunction issued, restraining them from diverting the water. A trial was had upon the merits; the defendants abandoning their claim of a right to go upon plaintiff's upland ground for the purpose of diverting the water.

The court therefore, and also upon the evidence, finds that the plaintiff is entitled to all the water upon the upland within the boundaries of her described claims. No satisfactory evidence of a substantial damage to plaintiff by the defendants entering upon her ground to divert the water having been shown, she is allowed nominal damages in the sum of $10. The defendants are denied anything on account of damages claimed by them.

The only question seriously contested in the case was that of the rights of the parties in the "beach" or shore lands immediately in front of and between the undisputed portion of plaintiff's claims and the line of ordinary low tide of the Pacific Ocean. Physical conditions at this place, as shown, are well described by the following extracts from certain alleged local mining rules and regulations introduced in the progress of the trial and the opinion of the court in the case of Revenue Mining Co. v. Balderston, 2 Alaska, 365, a case in which water rights on the same claims as those now involved were in question:

"The appearance of this district is, briefly, as follows: A sloping sand beach, which is covered at mean high tide by the sea, but which is bared at low tide. Back of the sand beach is a slightly higher bench, covered by tundra, and with some timber; this bench ex-

tends to the hills which rise abruptly from it. Through this bench run the Yakataga and White rivers, also a number of small creeks fed by water from the hills. In this bench are also a number of marshes or lagoons, varying with the varying seasons of the year, in the amount of water they contain. * * * As no placer mining claims could be legally located covering ground which is below mean high tide, the miners have always worked the beach regardless of competing miners at any point along the beach to which they could bring water. * * * Water used in mining is conveyed by ditch, flume, hose, or pumps to points desired on the beach. * * * It appears that the claims in question lie on a flat coastal plain, extending from the low-tide line of the Pacific Ocean beach back to a range of mountains parallel with the beach; that two lagoons or ancient river beds lie within the exterior boundaries of the claims; and that streams of water descend from the nearby mountains, and, flowing through the claims, enter these lagoons."

It appears from the evidence and statements of counsel that gold is found in the sands of the shore of the open ocean at this point and in those sands back of the shore proper that are uniform in appearance with the shore, but which are torn and beaten down by storm tides and other extraordinary tides and form an extension of and in the same plane with the sloping shore. The source from which the gold finds its way into these sands is a disputed and unsettled question; whether it has worked down from the abutting tundra banks or been carried to the shore by the incoming waves is not agreed. After severe storms a greater amount of gold is found in ruby sands in and near the surface of the beach and shore than is recovered at other times. The defendants contend for the right to go upon these shores and sands to extract the gold from them.

The plaintiff contends for the right to the exclusive possession of all the shore to the line of ordinary low tide. This claim she bases upon the shore having been included within the bounds of the claims as located, and upon the further contention that the owner of the abutting upland is entitled, subject to public navigation rights, to the exclusive possession of all parts of the shore. That therefore she may exclude all persons, save those engaged in navigation, therefrom at will.

The evidence shows that no posts or other permanent marks or monuments were placed upon the shore in connection with

the location of these claims at any time; that it was impossible to maintain monuments on the shore; that they would have been destroyed by the waves of the sea; that substantial posts were set upon the side lines of the claims upon the bank above the shore, as near it as they could be kept; that on these posts were posted notices describing the boundaries of the claim as extended toward the sea to a certain distance, which distance, in the estimation of the locator, would in each instance approximately reach the line of ordinary low tide, which estimation the court finds to be correct.

The court concludes that those notices, together with the other markings of the boundaries of the claim, were sufficient to include the shore, providing it was subject to placer location. The court finds that the plaintiff was not at any time actually or constructively in possession of the shore.

The evidence shows that only development work has been done upon plaintiff's claims; that, before they can be profitably worked, it will be necessary to bring from a distance additional water for the purpose; that in working the claims in this way it will be necessary for the plaintiff to sluice the waste sand into the ocean across the shore or upon the shore.

There was no evidence introduced of any operations of the defendants on the shore that in any way actually interfered with any work of the plaintiff in connection with her lands or with her access to the sea.

Thompson & Thompson, of Nome, and Ostrander & Donohoe, of Valdez, for plaintiff.

Frank H. Foster and Charles G. Ganty, both of Valdez, for defendants.

No controlling authority or convincing reason has been offered by plaintiff why Congress should in the matter of mining claims, and especially placers, have made an exception to the rule that grants of land by the United States on the ocean are bounded by the line of ordinary high tide. In view of this settled long-established and well-known rule of law, it is plain, had Congress intended to make a different provision in con-

ferring the right to acquire mineral land or in extending such right to Alaska, it would have expressly so provided.

Section 2319 of the Revised Statutes (U. S. Comp. St. 1901, p. 1424) provides:

"All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States."

Section 8 of the act of May 17, 1884 (Carter's Codes, p. 442), in extending the mining laws of Alaska, provides:

"The laws of the United States relating to mining claims, and the rights incident thereto, shall, from and after the passage of this act, be in full force and effect in said district."

That Congress intended no new departure in this particular is further shown by section 2 of the act approved May 14, 1898 (30 Stat. 409, c. 299, Carter's Codes, p. 455), as follows:

"That nothing in this act contained shall be construed as impairing in any degree the title of any state that may hereafter be erected out of said district, or any part thereof, to tidelands and beds of any of its navigable waters, or the right of such state to regulate the use thereof, nor the right of the United States to resume possession of such lands, it being declared that all such rights shall continue to be held by the United States in trust for the people of any state or states which may hereafter be erected out of said district. The term 'navigable waters,' as herein used, shall be held to include all tidal waters up to the line of ordinary high tide and all nontidal waters navigable in fact up to the line of ordinary high-water mark."

That Congress considered it had made no such departure is shown by section 26 of the act of June 6, 1900, making further provision for a civil government for Alaska and for other purposes (Carter's Codes, p. 139):

"Sec. 26. The laws of the United States relating to mining claims, mineral locations, and rights incident thereto are hereby extended to the district of Alaska: Provided, that subject only to such general limitations as may be necessary to exempt navigation from artificial obstructions all land and shoal water between low and mean high tide on the shores, bays, and inlets of Bering Sea, within the jurisdiction of the United States, shall be subject to exploration and mining for gold and other precious metals by citizens of the United States, or persons who have legally declared their intentions to become such, under such reasonable rules and regulations as the min-

ers in organized mining districts may have heretofore made or may hereafter make governing the temporary possession thereof for exploration and mining purposes until otherwise provided by law: Provided further, that the rules and regulations established by the miners shall not be in conflict with the mining laws of the United States; and no exclusive permit shall be granted by the Secretary of War authorizing any person or persons, corporation or company to excavate or mine under any of said waters below low tide, and if such exclusive permit has been granted it is hereby revoked and declared null and void; but citizens of the United States or persons who have legally declared their intention to become such shall have the right to dredge and mine for gold or other precious metals in said waters, below low tide, subject to such general rules and regulations as the Secretary of War may prescribe for the preservation of order and the protection of the interests of commerce; such rules and regulations shall not, however, deprive miners on the beach of the right hereby given to dump tailings into or pump from the sea opposite their claims, except where such dumping would actually obstruct navigation, and the reservation of a roadway sixty feet wide, under the tenth section of the act of May 14, 1898, entitled 'An act extending the homestead laws and providing for right of way for railroads in the district of Alaska, and for other purposes' shall not apply to mineral lands or town sites."

That the United States, during the existence of a territory, organized or unorganized, or a district, and prior to its admission as a state, may dispose of or reserve the tide or shore land within the same for lighthouses, forts, customs houses, or for other public or governmental purposes is certain; that it may do so in the discharge of treaty obligations or the care it has undertaken and exercises for the Indians and native tribes is probable; that it may do so by general grants to individuals is possible, although it is thought that the latter power, if existing, has not as yet been exercised.

In Shively v. Bowlby, 152 U. S. 47, 14 Sup. Ct. 566, 38 L. Ed. 331, in the opinion by Mr. Justice Gray, it is said:

"By the Constitution, as is now well settled, the United States, having rightfully acquired the territories, and being the only government which can impose laws upon them, have the entire dominion and sovereignty, national and municipal, federal and state, over all the territories, so long as they remain in a territorial condition. [Citing many cases.] We cannot doubt, therefore," continues Judge Gray, "that Congress has the power to make grants of lands below high-water mark of navigable waters in any territory of the United States, whenever it becomes necessary to do so in order to perform international obligations, or to effect the improvement of such lands.

for the promotion and convenience of commerce with foreign nations and among the several states, or to carry out other public purposes appropriate to the objects for which the United States hold the territory. But Congress has never undertaken, by general laws, to dispose of such lands, and the reasons are not far to seek.   *   *   * The United States, while they hold the country as a territory, having all the powers both of national and municipal government, may grant, for appropriate purposes, titles or rights in the soil below high-water mark of tide waters. But they have never done so by general laws, and, unless in some cases of international duty or public exigency, have acted upon the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the states, respectively, when organized and admitted into the Union."

The act of May 17, 1884, supra, further provides:

"That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress."

This provision merely protects a present possession at the date of the passage of that act, but it expressly reserves the disposition of title to future legislation. It was under this provision that the plaintiff prevailed in Sutter v. Heckman, 1 Alaska, 81, cited, supra; also same case at 188 and the same case on appeal (Heckman v. Sutter, 119 Fed. 83, 55 C. C. A. 635), not cited, wherein the plaintiff was decreed the exclusive possession of certain tidelands. The same is true of the cases of the Pacific Coast Co. v. McCloskey, 3 Alaska, 83, on appeal 160 Fed. 794, 87 C. C. A. 568, 22 L. R. A. (N. S.) 673, which will be seen upon examination of the latter case.

Regarding plaintiff's second contention that she has the exclusive right of possession to the shore abutting upon her mining claims in any event, and may exclude the defendants therefrom at will, without regard to whether they are erecting structures or otherwise interfering with her present right of access to and from the sea, it is not deemed necessary to review at length all the cases cited by plaintiff. Suffice it to say that those that are authority are not in point. The cases of Martin

v. Heckman, 1 Alaska, 165, Lewis v. Johnson, 1 Alaska, 529, appeal dismissed 118 Fed. 1016, 54 C. C. A. 681, Juneau Ferry Co. v. Alaska S. S. Co., 1 Alaska, 533, and Dalton v. Hazelet, 182 Fed. 563, 105 C. C. A. 99, all involved the exclusive right of the upland owner to wharf out over the abutting shore, a right exercised in aid of the superior right of navigation, and presumably facilitates access to the sea by the upland holder.

In the case of Revenue Min. Co. v. Balderston, 2 Alaska, 363, the plaintiff was awarded the shore because it was admitted, in an agreed statement of facts, that defendant's claim was legally located, reaching to the low tide line of the Pacific Ocean.

Those cases that are in point are no longer authority. Plaintiff places special reliance upon the case of United States v. Roth, 2 Alaska, 257, and Heine v. Roth, 2 Alaska, 416, both of which have been overthrown by the case of Columbia Canning Co. v. Hampton, 161 Fed. 60, 88 C. C. A. 224, not cited.

In the case of U. S. v. Roth, 2 Alaska, 264, it was said:

"Upon the facts and authorities, I conclude that, by reason of his lawful occupation and possession of his homestead, including the whole of Garden Island, the claimant was in lawful occupation and possession of all the shore lands along its meandered line; that such shore land is a valuable property, to which he has an inchoate but exclusive right of possession as against all the world, except the paramount proprietor—the government of the United States as trustee for the future state—that the defendant was and is a trespasser on such shore lands, and, under the stipulated facts, is guilty of trespassing on lands or premises in the lawful occupation of another. Judgment accordingly."

In Columbia Canning Co. v. Hampton, supra, in the opinion by the Court of Appeals for the Ninth Circuit, it is said:

"It follows from these authorities that while the owner or locator of lands in Alaska which border upon navigable or tidal waters has, under the general law, the right of access to such waters for the purpose of navigation, he can acquire no right or title in the soil below high-water mark, and he can have, therefore, no right of possession upon which he can base an action against an intruder whom he charges with interfering with and obstructing him in the erection and use of a structure upon the shore below such high-water mark. He may have, however, a right of action against an intruder who places obstacles on the shore that prevent him from having access to the navigable waters; but that is not this case. The plaintiff does not charge that defendants' structure is a nuisance, or that the

defendants are obstructing him in having access to the navigable waters of Lynn Canal. The charge is that defendants are erecting on the shore a structure of piles for a fish trap which will be an obstruction to a similar structure which the plaintiff had commenced to erect. This is not the statement of a cause of action under the general law relating to littoral rights, nor under any statute relating to the waters of Alaska to which our attention has been called."

This latter case is expressly referred to with approval in the recent case of Dalton v. Hazelet, 182 Fed. 561, at 572, 105 C. C. A. 99, at 110:

"In Columbia Canning Co. v. Hampton, 161 Fed. 64, 88 C. C. A. 224, the controversy related to the claim of the littoral owner to an exclusive right of driving piles for the purpose of a fish trap in front of his upland. Relief was denied in that case because it was not claimed that the defendants were obstructing the plaintiff's access to navigable waters."

See, also, 1 Lindley (2d Ed.) § 428.

Plaintiff is denied all relief prayed against defendants as concerns the shore land. It is further found that plaintiff's mining claims extend to the line of mean high tide, and that she is entitled, as against the defendants, to the exclusive possession thereof, from which she was, at the date named in the complaint, ousted by the defendants in their attempt to divert water from the upland of her claims.

Findings will be prepared in conformity with this decision.