HECKMAN et al. v. SUTTER et al.

(Circuit Court of Appeals, Ninth Circuit. March 7, 1904.)

No. 792.

1. PUBLIC LANDS—ALASKAN TIDE LANDS—RIGHT OF OCCUPANCY.

The provision of section 8, Act May 17, 1884, c. 53, 23 Stat. 24, 26, establishing a civil government for Alaska, and creating a land district therein, that "the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them, but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress," applies to all lands, including tide lands, over which the federal government has exclusive jurisdiction and power of disposal, and protects possessory rights which were then exercised and claimed for fishing or other purposes by occupants of adjoining uplands against others who assert a common right to fish thereon.

Appeal from the District Court of the United States for the First Division of the District of Alaska.

Chickering & Gregory, for appellants.

Piles, Donworth & Howe and Winn & Shackleford, for appellees.

Page, McCutchen & Knight, amici curiæ.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The case, as well as the acts of Congress bearing upon the question involved, will be found stated in the opinion of this court delivered on the former hearing. 119 Fed. 83, 55 C. C. A. 635. We there said:

"When, in 1884, Congress undertook to provide a civil government for Alaska, it made of the territory a land district; located a United States land office at Sitka; put in full force and effect therein 'the laws of the United States relating to mineral claims and the rights incident thereto,' with certain conditions not necessary to be mentioned, withholding therefrom the application of the general land laws of the United States, and expressly declaring 'that the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them, but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress.' Section 8, Act May 17, 1884, c. 53, 23 Stat. 24, 26. There has been no 'future legislation by Congress' that applies to the present case, for this case involves no question of purchase or entry, and concerns only the right of occupancy and use of certain of the lands of the United States, including a small strip of tide land, as against a similarly asserted right on the part of third persons, which occupancy and use in no manner interferes with the right of navigation of the public waters. The prohibition contained in the act of 1884 against the disturbance of the use or possession of any Indian or other person of any land in Alaska claimed by them is sufficiently general and comprehensive to include tide lands as well as lands above high-water mark. Nor is it surprising that Congress, in first dealing with the then sparsely settled country, was disposed to protect its few inhabitants in the possession of lands, of whatever character, by means of which they eked out their hard and precarious existence. The fact that at that time the Indians and other occupants of the country largely made their living by fishing was no doubt well known to the legislative branch of the government, as well as the fact that that business, if conducted on any substantial scale, necessitated the use of parts of the tide flats in the putting out and hauling in of the necessary seines. Congress saw proper to protect by its act of 1884 the possession and use by these Indians and other persons of any and all lands in Alaska against intrusion by third persons, and so far has never deemed it wise to otherwise provide. That legislation was sufficient authority, in our opinion, for the decree of the court below securing the complainants in the use and possession of land which the evidence shows and the court found was held and maintained at the time of their disturbance therein by the defendants, and for years theretofore had been so held and maintained."

Further consideration has but confirmed us in the correctness of these views. The act of 1884 made no provision for the disposition of the title of any of the public domain except mineral lands; on the contrary, it thereby expressly withheld from Alaska the application of "the general land laws of the United States." Section 8, Act May 17, 1884, c. 53, 23 Stat. 24, 26. Those general land laws are not, therefore, the source from which to derive the meaning of Congress in using the words "any lands" in the proviso of the act of May 17, 1884, "that the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them." Having extended to Alaska the laws of the United States relating to mineral claims only, if Congress had intended to protect the Indians and other persons in their possession of or claim to such mineral claims only, one would naturally expect the intention to be manifested by the words "such mineral claims," or "such mineral lands," or other equivalent limited expression, and not by the broad and comprehensive words "any lands," used in the act of 1884. Nor is it reasonable to suppose that Congress

intended the broad and comprehensive terms thus used by it to be limited by the interpretation put upon the term "public lands" in the general land laws, which it expressly provided should not be in force in Alaska. In providing for a civil government for that territory, as it did by the act of 1884, Congress was dealing with the then condition of the country; and in providing for such a government it saw proper to protect the existing possession of any and all lands then held by the Indians or other persons in the territory. These, as Congress must have known, were at the time but few in number. It did not provide for the protection of the possession of any lands by any person or persons who might acquire possession or make claim thereto in the future. It is true that it has never been the policy of the United States to dispose of its tide lands, but, on the contrary, that its policy has always been to retain them for the benefit of the future state in which they might lie. But it is thoroughly settled that the United States has all the power of national and municipal government over its territories, and may, if it sees fit to do so, grant rights in or titles to the tide lands of its territories as well as the public lands therein situated above high-water mark. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, and the numerous cases there cited.

Most of our people thought that Mr. Seward was engaged in a sorry business when, in 1867, he bought from Russia for $7,200,000 what is now the territory of Alaska, from whose ground is now taken by the enterprising miners more than that amount in gold in a single summer. Who knows but that, with its rapid settlement, the building of roads and railroads, telegraph and telephone systems, the development of its vast fisheries and mines and other possible resources, Congress may some day admit it to statehood, with the same right to the tide lands within its borders that passed to California, Oregon, and Washington upon their admission to the Union? In each of these states, in providing for the disposal of such tide lands, the Legislature gave a preferred right of purchase to persons in possession thereof, and who had erected improvements thereon. St. Cal. 1867-68, p. 716, c. 543; Hill's Ann. Laws Or. 1892, § 3599; St. Wash. 1889-90, p. 431. In the state of Washington the statute cited conferred upon the upland proprietor the preferred right of purchasing the tide lands in front of him, and the Supreme Court of that state in the case of West Coast Improvement Co. v. Winsor, 8 Wash. 490, 36 Pac. 441, held that no mere trespasser should be allowed to occupy or in any manner interfere with the possession of the upland owner of the tide lands upon his front, until such time as he could exercise his right to purchase the same from the state; saying, among other things:

"If the courts should hold that the upland owner had no right to prevent one having no claim whatever from squatting upon tide lands in his front, we should have such a state of facts existing as would tend greatly to the prejudice of the public interests. The delays of the law are such that it may be years before it will be finally determined as to the right to acquire ownership under the state, and if, during all that time, the possession of such tide lands is to be the subject of an uncontrolled scramble between those claiming no right whatever thereto, a most objectionable state of affairs will be inaugurated. In our opinion, the courts are not obliged to sit idly by and allow the unrestrained

cupidity and passions of trespassers, in which might will be the all-powerful factor, to have full play. The courts, by retaining matters in statu quo, will in no manner interfere with the rightful jurisdiction on the part of the proper authorities as to the possession and ownership of the tide lands of the state."

There was, as was said in our former opinion herein, nothing very surprising in the fact that Congress, in first dealing with the then sparsely settled territory of Alaska, was disposed to protect its few inhabitants in the possession of lands, of whatever character, until it should see fit to make other disposition of them. In referring to the proviso of the act of 1884, by which it did so, the District Court for the District of Alaska, in charging the jury in the case of Carroll v. Price, 81 Fed. 137, said:

"The court therefore charges you that the United States holds paramount title to tide lands in this territory; and, where the right of navigation is not impaired, rights of possession by citizens of the United States to such tide lands will be determined by the same rules of law as govern similar rights on the uplands; and this court will apply to the tide lands the rules that American citizens may occupy, possess, use, and improve the same, subject, however, to the paramount right of free navigation; and that the prior possession will determine the prior right, until 'future legislation by Congress,' as to uplands, or until the ultimate sovereign, whether state or federal, having title to tide lands, shall otherwise provide in relation thereto."

That case was referred to by the Supreme Court in the case of Malony v. Adsit, 175 U. S. 281, 20 Sup. Ct. 115, 44 L. Ed. 163, which was an action to recover possession of an undivided half of a tract of land in the town of Juneau, Alaska, the plaintiff relying solely upon right of prior occupancy and actual possession, which was sustained both by the trial court and by the Supreme Court on appeal. In the course of the opinion of the Supreme Court it was said:

"The same view of the nature of a title to a lot in a town site in Alaska, under these acts of Congress, was expressed by the District Court of the United States for the District of Alaska in the case of Carroll v. Price, 81 Fed. 137. As, then, the only kind of estate that could be held was that of possession, it was sufficient for the plaintiff to allege that his was of that nature."

It is a mistake to suppose that the right to control and regulate the fisheries is on the same plane with the right to control navigation. The latter is paramount, and always resides in the general government. The right of fishery is, it is true, a common right, but it may be regulated and controlled by a state. In McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248, the question involved was whether the state of Virginia could prohibit the citizens of other states from planting oysters in Ware river, a stream in Virginia where the tide ebbed and flowed, when its own citizens had that privilege. In that case it was said that the principle has long been settled that each state owns the beds of all tide waters within its jurisdiction, unless they have been granted away; and that in like manner the states own the tide waters themselves, and the fish in them, so far as they are capable of ownership while running; and the court added:

"The title thus held is subject to the paramount right of navigation, the regulation of which, in respect to foreign and interstate commerce, has been granted to the United States. There has been, however, no such grant of power over the fisheries. These remain under the exclusive control of the state, which has consequently the right, in its discretion, to appropriate its tide waters and their beds to be used by its people as a common for taking and cultivating fish,

so far as it may be done without obstructing navigation. Such an appropriation is, in effect, nothing more than a regulation of the use by the people of their common property. The right which the people of the state thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is, in fact, a property right, and not a mere privilege or immunity of citizenship."

This property right, while existing within a territory of the United States, is, as has been seen, within the absolute control of Congress; and when, as in the case in hand, the reasonable exercise of it requires the clearing and use of a small portion of the tide lands, there seems nothing even unjust in protecting such possession against the invasion of a rival in the business. Nor does such temporary concession of such right of occupancy in any way involve a concession of any title to such tide lands, or any permanent right of possession. The case of Pacific Steam Whaling Co. v. Alaska Packers' Association (Cal.) 72 Pac. 161, is readily distinguishable from the present case. In that case no reference whatever was made to the act of Congress of May 17, 1884, upon which our judgment rests, nor did it appear there that the Alaska Packers' Association claimed to have been in the possession of the piece of tide land there in question at the time of the passage of the act of 1884 by Congress, or that it claimed such possession under any person who was in such occupancy at that time; and the court itself was careful to add to its observations on the common right of fishing in the public waters the following:

"We need not inquire to what extent the government—either federal or state —could give an exclusive private right of fishery in such public waters. No such right is asserted here." 72 Pac. 163.

The judgment is affirmed.