<hr/>

## COLUMBIA SALMON CO. v. BERG.

(Third Division. Valdez. August 26, 1916.)

### No. S/93.

1. FISH ☞3—NAVIGABLE WATERS—WAR DEPARTMENT PERMIT.

A permit to establish a fish trap in navigable waters on the shores of Alaska does not confer any right of property in the site mentioned therein. It amounts to no more than a certificate from that department that the erection of a fish trap there will not interfere with navigation.

2. FISH ☞10(1)—LICENSES.

The possession of a territorial license to fish confers no property right in the fish site claimed. It merely authorizes the holder to carry on the business of catching or dealing in fish in Alaska.

3. FISH ☞5(2)—CONTRACT—EXECUTORY—CONSTRUCTION.

The defendant agreed to build a fish trap and to fish for the S. S. Co. The company was to become the owner of the location of the trap site upon paying for the fish caught for that season, which it never did. Held, the S. S. Co., not having paid the consideration agreed upon, did not acquire any title in the trap site, which has remained in the actual possession of the defendant, and is now in his possession as its owner.

4. NAVIGABLE WATERS ☞36(4)—TIDELANDS—FISH TRAP SITES.

A fish trap on the shores of Alaska is destroyed or carried away by the elements each fall or winter, and the tideland is thus left bare and without visible signs of possession. To maintain a continuous right to such a trap site, the one claiming it must see to it that his structures are kept in repair and used for the purpose for which they are intended.

5. NAVIGABLE WATERS ☞36(4)—TIDELANDS—RIGHT OF POSSESSION—TRESPASS.

One may lawfully acquire a right of possession on the tidelands in Alaska by going on the same when not in the actual possession of another. His pedis possessio would be good as against any one but the United States; but, if such structures as may

<hr/>

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

be erected are destroyed, the one claiming the site must see to it that he again asserts his dominion over it by either an inclosure or by the erection of such improvements on the land as the nature of the situation or the purpose for which it is to be used requires.

The plaintiff and defendant both claim the same fish trap site near the shore, on the east side of Kenai Peninsula, between Ninilchik and Kasilof, on the waters of Cook Inlet.

Defendant entered into the following agreement with the Seldovia Salmon Company on April 20, 1915:

"This agreement, made and entered into this twentieth day of April, 1915, between the Seldovia Salmon Company, a Washington corporation, hereinafter mentioned as the company, and Emil Berg, party of the second part, witnesseth:

"The company agrees to furnish such piles and fishing gear as in their judgment is necessary for the proper operation of a fish trap, to be constructed between Ninilchik and Kasilof, at the location known as 'Waterfalls,' and which was fished by the party of the second part during the fishing season of 1914.

"The company agrees to furnish pile driver, drive piles, hang wire and gear, and complete construction of a trap at the above location.

"The party of the second part agrees to sell to the company each and every king and red salmon caught in said trap during the season of 1915, and the company agrees to pay the party of the second part twenty-five (25) cents for each and every king salmon and four and one-half (4½) cents for each and every red salmon received by them from the said fish trap, operated by the party of the second part.

"In consideration of the company furnishing gear, etc., constructing trap, receiving and paying for the fish as provided above, the pa ty of the second part agrees that all right, title, and interest he may have at this time in said fish trap location is transferred to the company, and the company will be the sole owners of said location referred to in this agreement.

"The company agrees to pay the party of the second part all moneys due him as specified above, at the close of the fishing season of 1915.

"In testimony whereof, the parties hereto have executed and signed this agreement, this twentieth day of April, 1915.

"[Signed]                    Seldovia Salmon Company,
          "By E. F. Randolph, Secretary and Treasurer.
"Witnesses to signature: S. J. Lidston.
                    "Emil Berg,
                         "Party of the Second Part."

Said Seldovia Salmon Company failed in business in the fall of 1915 and failed to pay the defendant the sum due him under said agreement, amounting to more than $3,000. A

receiver was appointed by this court, and later bankruptcy proceedings were had in Seattle, Wash., which superseded the receivership. Sale was made of all the assets of said Seldovia Salmon Company by the trustee in bankruptcy to Robert Lindenberger.

In the trustee's bill of sale, dated February 10, 1916, is the following provision:

"Also any right, title, interest, or estate of the said Seldovia Canning Company, a corporation, or of this grantor as such trustee thereof, in and to any trap sites, cabin sites, trap houses, or buildings whatsoever, and any surveys of such trap sites or locations, or of any other trap site or location made by C. S. Hubbell, the said trap sites and the property located thereon being hereby expressly excepted from the warranty of this deed and bill of sale."

On March 13, 1916, said Lindenberger conveyed to the plaintiff, the Columbia Salmon Company, "for the consideration of ten dollars and other good and valuable considerations," the property conveyed to him by said trustee in bankruptcy.

About March 20, 1916, defendant and one other man began the construction of defendant's lead for a fish trap on said site, and by May 20th had constructed about 800 feet of said lead, at a cost, as testified by the defendant and his witnesses, of $600. Plaintiff's witnesses testified it was not worth over $200.

About May 20th the plaintiff appeared with a pile driver for constructing a fish trap and lead, and commenced driving piling, which would necessarily interfere with, obstruct, and render worthless the fish trap of defendant. Upon defendant's protesting, and, as plaintiff's witnesses claimed, threatening to prevent further working thereat, the plaintiff, on the 22d day of June, 1916, procured an order requiring the defendant to show cause on the 26th day of July, 1916, why he should not be enjoined and restrained from interfering with plaintiff in the construction and operation of its said fish trap. In the meantime the defendant was restrained and enjoined from so doing.

The tide at said fish trap site has a rise and fall of about 30 feet, and in its ebb and flow covers and uncovers about 900 feet of tide lands.

The erection of such fish traps is impliedly authorized by section 262, Comp. Laws Alaska 1913, which provides:

"It shall be unlawful to lay or set any seine or net of any kind within one hundred yards of any other seine, net, or other fishing

appliance, which is being or which has been laid or set in any of the waters of Alaska, or to drive or construct any trap or any other fixed fishing appliance within six hundred yards laterally or within one hundred yards endwise of any other trap or fixed fishing appliance."

The plaintiff claims it has the better right to this fish trap site, in addition to its claim of title by purchase from Lindenberger, and also by reason of its having procured a license from the territorial treasurer under act of the territorial Legislature (chapter 76, Session Laws 1915), which provides:

"Any person, firm or corporation prosecuting or attempting to prosecute any of the following lines of business in the territory of Alaska, shall apply for and obtain a license, * * * as follows: * * *

"8th. Fish traps: Fixed or floating, one hundred dollars per annum. So-called dummy traps included."

And also by reason of having procured a permit from the War Department as required by the Rivers and Harbors Act approved March 3, 1899 (30 Stat. 1154, 1155). This War Department permit provides:

"That this authority does not give any property rights, either in real estate or material, or any exclusive privileges, and that it does not authorize any injury to private property or invasion of private rights, or any infringement of federal, territorial, or local laws or regulations, nor does it obviate the necessity of obtaining territorial assent to the work authorized. It merely expresses the assent of the federal government so far as concerns the public rights of navigation."

L. V. Ray, of Seward, for plaintiff.
Morford & Finnigan, for defendant.

BROWN, District Judge. Several questions are here presented for determination:

What effect has the issuance of said territorial license and War Department permit? On this question it was held in the recent case of the Pure Food Fish Company, a Corporation, v. Anacortes Fish Company, a Corporation, by the writer, on the 3d day of June, 1916, in the First division of Alaska, that neither said license nor said permit gives the holder any property right. The permit from the War Department merely amounts to a certificate from that branch of the government that the erection of a fish trap at the point named will

not interfere with navigation. The territorial license merely authorizes the holder to carry on a certain business, to wit, that of catching fish, but does not grant to the holder any place of business, any more than the issuance of a saloon license grants to the holder a building in which to conduct a saloon, or the issuance of a mercantile license a building in which to conduct a store.

From all that appears the defendant, had he been permitted to complete his fish trap in the spring of 1916, might have applied for and received a territorial license, or some larger company coming to his aid in building the trap, might have taken out such a license. His testimony shows that he had an agreement with the Alaska Packers' Association to furnish him a pile driver to complete the trap and to furnish him webbing and gear.

As to defendant's not having a War Department permit, if he were otherwise rightfully in possession of said trap site, a third person ought not to be permitted to deprive him of it because he had not procured such a permit. The government itself, by proper proceedings, would be the only one who could raise the question.

The next question arises as to the effect of the agreement between the Seldovia Salmon Company and defendant, dated April 20, 1915.

From this it appears that defendant's right to this fish trap site was recognized and acknowledged by the said Seldovia Salmon Company, and it desired to acquire said site for itself and agreed that:

"In consideration of the company furnishing gear, etc., constructing trap, receiving and paying for the fish as provided above, the party of the second part agrees that all right, title and interest he may have at this time in said fish trap location, is transferred to the company, and the company will be the sole owners of said location referred to in this agreement."

The undisputed testimony shows that the defendant, acting under this agreement, caught and delivered fish to said Seldovia Salmon Company to the value of more than $3,000, and that he also paid for work and labor on said fish trap amounting to about $300, and that said company wholly failed to pay therefor.

A fair construction of this agreement would seem to be that it is an executory one and that said company was to become

the owner of said location for fish trap site upon paying for said fish, which it never did. The gear, webbing, and piling furnished by said company in the construction of said fish trap was of no value to defendant, for the undisputed testimony shows that, owing to the great tides in Cook Inlet and to the ice flowing to and fro during the winter season, fish traps of this character are carried away and destroyed each winter, so that they have to be renewed each spring for the fishing season, which lasts only about six weeks, during the months of July and August.

The plaintiff claims that the defendant is bound by the bankruptcy proceedings and must look to the bankrupt estate for his compensation. The testimony shows that there was a dividend of about seven per cent. distributed from said estate and that pending litigation offers a possible chance of some further payment. The trustee in bankruptcy, however, in making the bill of sale of the assets of said corporation, expressly excepts any warranty of the title to fish trap sites and undertakes to transfer and convey only such rights as the said Seldovia Salmon Company had.

This is of significance, inasmuch as it constitutes notice to the purchaser from the trustee in bankruptcy of the nature of the title or lack of title in the bankrupt in and to fish trap sites. The plaintiff insists that because Mr. Randolph, the superintendent of the Seldovia Salmon Company, listed the claim of the defendant in the bankruptcy court and that some notice thereof was received by the defendant in February, 1916, that he is bound thereby to look to the assets of said bankrupt in satisfaction of his claim, and plaintiff cites authorities to the effect that one having notice of bankruptcy proceedings is bound in ordinary cases as to his claims adverse to the estate.

In the view I take of this case, the ownership of said property never passed to the Seldovia Salmon Company, but the title and the possession remained in the defendant, who is not concluded by the bankruptcy proceedings, and no construction ought to be indulged which in effect works an injustice, when another and a reasonable construction will protect his rights and work no injustice upon the plaintiff.

The defendant remained in possession of said fish trap site during the season of 1915 and seems never to have surrendered the same. The agreement made by him as above stated being an executory one, he agreed to sell the same only

upon receiving his payment therefor, or the payment for the fish, which amounts to the same thing.

The third question seems to be the controlling one, to wit: What rights can one acquire to a fish trap site of this character other than that actually held, occupied and maintained by him, by means of some substantial physical structure, and whether, if such structure is entirely destroyed and swept out by the seas and grinding ice each winter, the one having used the site the previous year may still go upon the site and claim a prior right thereto by reason of said former occupancy?

The tidelands and the navigable waters belong to the United States. Any person may go upon tidelands or upon shallow navigable waters and use and occupy the same for any lawful purpose. A right is acquired by taking actual physical possession of the area claimed and used, as in the case of hunting, trapping, or "fishing in streams" upon public lands of the United States. One may acquire physical possession of a certain site or location and be protected from trespass from another. His pedis possessio would be good as against any one except the United States, but, if such structure as may be erected is destroyed, the one claiming the site must see to it that he again asserts his dominion over it by either an inclosure or the erection of such improvements on the land as the nature of the situation or the purpose for which it is to be used requires.

The tenure being dependent upon actual physical possession or the occupancy by substantial improvements, the owner must see to it that the same are maintained. It might be contended, that upon the destruction of these fish traps each winter that the former occupant should have a "reasonable time" within which to begin operations the following spring to construct another, but this would give rise to greater confusion and probable litigation as to what would be a "reasonable time," and in each case would arise questions of storm and weather conditions, the character of the water and ice and the season, as preventing one from beginning within a "reasonable time." It seems to me that the only safe rule would be that one claiming to exercise the privilege of occupying lands or waters of the character herein involved must see to it that his structures are kept in repair and used for the purpose for which they are intended.

In the case of Carroll v. Price (D. C.) 81 Fed. 137, decided by Judge Delancy of the District Court of Alaska, in 1898, it is said:

"Where two persons claim adversely to each other the possession of any piece or parcel of government land, the one having the prior possession has the prior right."

"Where the right of navigation is not impaired, possessory rights to tidelands here will be determined by the rules of law governing similar rights to uplands until 'future legislation by Congress' concerning such uplands, and, as to the tidelands, until the ultimate sovereign, whether state or federal, shall otherwise provide."

The case of Pacific Steam Whaling Co. v. Alaska Packers' Association, 138 Cal. at page 636, 72 Pac. at page 163, a case arising over the right to catch salmon along the shores of Alaska, the court said:

"The right of fishery in the waters of the ocean, whether in the open sea or where the waters ebb and flow over tidelands, is a public right which may be exercised by any citizen. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, and cases there cited; Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; Mann v. Tacoma Land Co., 153 U. S. 273, 14 Sup. Ct. 820, 38 L. Ed. 714. In its very nature, the exercise of the right of fishing in the public waters of the ocean is not, and cannot be, exclusive. Its exercise, no matter by whom, or for what length of time, is only the exercise of a public right. There can be no possession, for the purpose of fishery, of an area of land covered by the waters of the ocean that is at all analogous to an actual possession of a tract of upland which might give the possessor a right of action against a mere trespasser. One who exercises this public right of fishery in the sea does not by that act make himself a trespasser. We need not inquire to what extent the government—either federal or state—could give an exclusive private right of fishery in such public waters. No such right is asserted here. Therefore upon the subject of defendant's asserted prescriptive right we are of the opinion that the court below did not commit any error."

In this case, however, the right of exclusive possession is asserted by reason of the authority given (or necessarily implied) by said section 262, Comp. Laws Alaska 1913, where it is provided that one shall not drive or construct a trap within 600 yards laterally or 100 yards endwise of any other trap or fixed fishing appliance.

Not only, then, is one permitted to erect and maintain a structure for any lawful purpose upon uplands or tidelands

5 A.R.—35

of the United States, but here is express legislative authority given by Congress to construct, maintain, and operate fixed appliances for fishing upon such lands, and prohibiting the interference therewith by the construction of other traps within certain distances.

It might well be that the legislative authority should go further, and provide a method of locating and holding said trap sites, as was done by the state of Washington. Act March 13, 1899, § 9 (Laws 1899, p. 203), which provides that a person, after having obtained a fish license, should indicate locations for traps or pound nets by driving at least three substantial piles thereon, on which must be posted the license number. Elwood v. Dickinson, 26 Wash. 631, 67 Pac. 370.

But Congress has not legislated on this matter and the court has no authority to substitute its opinion for such legislation and say 'that certain acts done will give a preference or prior right to a fish trap location, other than the actual going upon the site and constructing a trap thereon, and while such work is being prosecuted with all due diligence, one is entitled to be protected in the possession thus acquired and held.

In the case of Heckman v. Sutter, 128 Fed. 393, 63 C. C. A. 135, a case appealed from the district court of Alaska, First division, the court quotes with approval the language used in the case of Carroll v. Price, supra, and sustains generally the right of American citizens "to occupy, possess, use and improve" such lands (tidelands as well as uplands), subject, however, to the paramount right of free navigation, and that the prior possession will determine the prior right.

There is an analogous class of cases of persons sometimes called "squatters" going upon tide flats in front of towns in Alaska, no title to which can be acquired, and maintaining possessory rights, which are respected, and the subject of sale and transfer and of taxation.

Regardless then of the former ownership or claim of ownership to this fish trap site, the defendant seems to have been first in point of time in entering upon and taking physical possession of this fish trap site, and was exercising such diligence in the erection and construction of the same as entitled him to be undisturbed therein, when the plaintiff came upon the premises and interfered with his prior possession, and later, upon representing that he was unlawfully interfering with it, procured the restraining order against the defendant, upon the

granting of which the plaintiff proceeded to complete its own fish trap to the exclusion of the defendant.

The Seldovia Salmon Company would not be in a very good position to come into a court of equity and claim the right to take this fish trap site from defendant under its agreement of April 20, 1915, after the defendant had worked at the arduous and perilous occupation of fishing during the season of 1915 in the rough and dangerous waters of Cook Inlet, and furnished the said company with fish to the value of $3,000, and for which said company has not paid him. I cannot see that the plaintiff in this case is in any better position than the former company. The restraining order issued must be vacated and set aside, and the plaintiff's complaint dismissed, with costs to the defendant.