HYNES, Regional Director, Fish and Wild-life Service, Department of the Interior, v. GRIMES PACKING CO. et al.

No. 11585.

Circuit Court of Appeals, Ninth Circuit.

Nov. 21, 1947.

As Amended Jan. 12, 1948.
Writ of Certiorari Granted April 5, 1948.

A. Devitt Vanech, Asst. Atty. Gen., Harry O. Arend, U. S. Atty., and Willliam E. Berrett, Asst. U. S. Atty. both of Fairbanks, Alaska, and Roger P. Marquis and S. Billingsley Hill, Attys., Dept. of Justice, both of Washington, D. C., for appellant.

Edward F. Medley, Frank L. Mechem, and W. C. Arnold, all of Seattle, Wash. (Covington, Burling, Rublee, Acheson & Shorb, of Washington, D. C., of counsel), for appellees.

Before DENMAN, HEALY, and BONE, Circuit Judges.

DENMAN, Circuit Judge.

Appellant Hynes appeals from a permanent injunction enjoining him "from enforcing or attempting to enforce the restrictive provisions of Section 208.23(r) of the 1946 Alaska Fisheries General Regulations and from seizing any boats, seines, nets, or other gear and appliance used or employed in fishing by the plaintiffs in the waters in and adjacent to the Karluk Indian Reservation situated on Kodiak

Island, Alaska, three thousand feet seaward from the shore at mean low tide or any fish taken therewith, or from arresting any of plaintiffs' fishermen who carry on fishing operations in said waters."

The district court found that appellant, as Regional Director of the Fish and Wildlife Service of the Department of the Interior, had threatened to seize the appellees' fishing boats and catches of salmon and to arrest their fishermen, some six hundred in number, in the manner prohibited by the injunction, purporting to act under the summary procedures of Section 6 of the White Act of June 6, 1924, 48 U.S.C.A. § 226.

The court held against appellant's contention that these ocean waters below low tide [1] had been included in a reservation [2] for the Indians of Karluk village located on Shelikof Strait, giving the Indians a monopoly of fishing there. It further held that an Alaska Fisheries General Regulation 208.23(r), designated to give fishing rights to the Karluk Indians in such purportedly reserved ocean waters and denying to all others the right to fish there unless licensed by the Indians to participate in their monopoly, violated Section 1 of the White Act, considered infra, providing that if any persons are allowed to fish in Alaskan waters none shall be excluded.

Regulation 208.23(r) of the Secretary of the Interior purports to create a monopoly of fishing in the Karluk Indians in the above described ocean waters by providing:

"Sec. 208.23 Waters closed to salmon fishing. All commercial fishing for salmon is prohibited as follows: * * *

"(r) All waters within 3,000 feet of the shores of Karluk Reservation (Public Land Order No. 128, May 22, 1943), beginning

at a point on the east shore of Shelikof Strait, on Kodiak Island, latitude 57° 32' 30" N., thence northeasterly along said shore to a point 57° 39' 40"."

"The foregoing prohibition shall not apply to fishing by natives in possession of said reservation, nor to fishing by other persons under authority granted by said natives (49 Stat. 1250). Such authority shall be granted only by or pursuant to ordinance of the Native Village of Karluk, approved by the Secretary of the Interior, or his duly authorized representative."

It is thus apparent that regulation 208.23 (r) does not contemplate that the ocean waters there involved are ordinary waters open to fishing subject to usual regulations for fish preservation, but that the regulation is based upon the assumption that there is a reservation of these waters in which there is a monopoly of fishing in the Karluk Indians. Further that it is a monopoly in which these Indians may sell licenses to others to participate. Indeed, the appellant claims that the appellee fishing companies and all others have no cause to complain because they could buy such licenses from the Indians to participate in their monopoly and that the appellees have obtained such licenses in the past, and hence have been able to seine as many fish as they would if the regulation had not existed. The regulation has no other purpose than to create the Indians' monopoly on the supposition that an Indian reservation in fact has been created and that the Secretary has a right to permit the Indians to fish there and deny the right to all other fishermen not so licensed.

The primary question for our determination is whether the Secretary of the Interior was authorized by Congress to create an Indian reservation in these waters below low

---

[1] The injunction and present litigation are not concerned with the rights of the Karluk Indians or others in the eastern waters of Shelikof Strait between high and low water.

[2] In Section 1 of Public Land Order No. 128 of May 22, 1943, the Secretary of the Interior designated as a reservation for the Karluk Indians 35,200 acres of land on Kodiak Island bordering on the east shore of Shelikof Strait. Section 2 adds to the land in the reservation the waters referred to in the court's permanent injunction, as follows:

"2. The area described above and the water adjacent thereto extending 3,000 feet from the shore line at mean low tide, are hereby designated as an Indian reservation for the use and benefit of the native inhabitants of the native village of Karluk, Alaska, and vicinity."

tide for, if they are waters not so reserved, monopoly fishing rights therein are prohibited by Section 1 of the White Act, 48 U.S. C.A. § 221 et seq. Since we decide that Congress has not given such authorization to the Secretary, we are not concerned with the question whether—even if so reserved— regulation 208.23(r) violates the White Act in permitting the licensed fishermen other than Indians to fish there and refusing the right to the unlicensed.

Appellant contends that Congress created the power in the Secretary to reserve to the Karluk Indians such below low tide ocean waters by Section 2 of the amendment of 1936, 48 U.S.C.A. § 358a, of the Wheeler-Howard Act of 1934, 48 Stat. 984, 25 U.S.C. A. § 461 et seq. Section 2 describes what of the several classes of lands of the United States may be so covered in Indian reservations.

"Sec. 2. That the Secretary of the Interior is hereby authorized to designate as an Indian reservation [a] any area of *land* which has been reserved for the use and occupancy of Indians or Eskimos by section 8 of the Act of May 17, 1884 (23 Stat. 26), or [b] by section 14 or section 15 of the Act of March 3, 1891 (26 Stat. 1101), or [c] which has been heretofore reserved under any executive order and placed under the jurisdiction of the Department of the Interior or any bureau thereof, together with [d] *additional public lands* adjacent thereto, within the Territory of Alaska, or any other *public lands* which are actually occupied by Indians or Eskimos within said Territory: Provided, That the designation by the Secretary of the Interior of any *such* area of land as a reservation shall be effective only upon its approval by the vote, by secret ballot, of a majority of the Indian or Eskimo residents thereof who vote at a special election duly called by the Secretary of the Interior upon thirty days' notice: * * *." (Emphasis supplied.)

Concerning the phrase "any area of land which *has been* reserved," it is not contended that these Indians had had reserved to them any of the below tide waters of Shelikof Strait by virtue of the Act of May 17, 1884, 48 U.S.C.A. § 356, or of the Act of March 3, 1891, 48 U.S.C.A. § 358, or by any prior reservation placed under the jurisdiction of the Department of the Interior.

Whatever power the Secretary of the Interior had to reserve for them any lands is created by that portion of Section 2 which reads "The Secretary of the Interior is hereby authorized to designate * * * additional *public* lands adjacent thereto, within the Territory of Alaska, or any other *public* lands which are actually occupied by Indians or Eskimos within said Territory." In this respect the 1936 Act differs from the above Acts of 1884 and 1891 which use the general phrase "lands" without the qualifying adjective "public."

I. *Congress in the 1936 amendment to the Wheeler-Howard Act, authorizing the Secretary of the Interior to reserve "public lands" for Alaska Indian tribes, did not empower him to reserve ocean lands below low water mark. It did not intend to create in the Indians communal monopolies in such salmon fishing waters about the long established packing plants from which would be excluded the thousands of white fishermen employed in producing for the world, but principally the United States, its largest supply of canned fish food.*

The evidence shows that a large part of the 30,000 Alaska Indians live in over eighty groups, most of them at the mouths of streams into which run the salmon seeking to spawn. Prior to the coming of the canning and packing plants, the Indians smoked the salmon for winter use, that fish being their principal article of diet. By a process of survival these Indian villages are at the rivers having the largest salmon runs.

Over a half century ago American enterprises began to supply the world, principally the United States, with these salmon processed into cans. These enterprises grew until their investment of upwards of seventy million dollars added to the world's food supply in the three years preceding the 1936 statute, under which the Indian fishing monopolies here in question were purported to be created, an annual average of 5,947,518 cases of 48 pounds each—that is 285,480,899 pounds valued at $30,918,700. In 1935 9,205 fishermen in 845 ves-

sels and 3,989 boats and 11,861 processing employees were engaged in this food production.

Congress in 1924 in the so-called White Act, hereafter considered, had recognized the character of this addition of this food to the world's commerce by placing the fishing regulations under the Secretary of Commerce. It remained there until 1939, three years after the 1936 Act here to be construed, when, under the executive reorganization act of that year, 53 Stat. 561, it was transferred to the Secretary of the Interior. Such a shift in the administrator does not change the Congressional recognition of the addition to commerce of this food supply.

For some time before 1924 the Department of Commerce had created a series of monopolies of exclusive fishing in certain of these Alaskan food processors. The Indians through their counsel joined with other processors excluded by the monopolies to obtain relief from Congress and, in response to their appeals, the Congress in 1924 enacted the White Act. That Act ended the monopoly system by providing that every fishing regulation made by the Secretary of Commerce "shall be of general application within the particular area to which it applies, and that *no exclusive or several right of fishery* shall be granted therein nor shall *any citizen of the United States* be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of Commerce." (Emphasis supplied.) 48 U.S.C.A. § 222.

Whether prior to 1924 citizenship had been conferred on the Alaska Indians and Eskimo who came into the United States not by conquest but by acquisition under the Russian treaty, they clearly were recognized as citizens by the Act of June 2, 1924, 43 Stat. 253, four days before the White Act became law. As such citizens they obtained the freedom from a monopoly exclusion from the fishing waters which they sought in their advocacy of the White Act. This was made apparent by the report on that Act of the House Committee (H.Rep. No. 357, 68th Cong., 1st.Sess. p. 2):

"At the present time it is the policy of the department as one means of control of fishing to grant a limited number of fishing permits within any designated area and to exclude all others from fishing rights therein. Your committee does not question the purpose of the department in this regard, but it has reached the unanimous and positive opinion that this practice of granting exclusive fishing privileges should cease and in this section it is declared that all regulations authorized to be made shall be of general application and that no exclusive or several right of fisheries shall be granted, nor shall any citizen be denied the right to take fish in waters where fishing is permitted. This declaration of policy and prohibition of law was earnestly urged upon the committee by the Delegate from the Territory, Mr. Sutherland, and has the general support of the people of the Territory."

Senator White, author of the bill, stated (65 Cong.Rec. 5974):

"The Committee inserted this provision in order to do away with that exclusive right of fishing and to insure to every citizen of the United States equality of right and equality of opportunity."

The contention of the appellant is that Congress in the 1936 amendment of the Wheeler-Howard Act reversed the non-monopoly policy in Alaska fisheries and authorized the Secretary to create a series of monopolies of the Alaska fishing waters. This the Secretary proceeded to do, beginning in 1943, after waiting seven years after the claimed authorization was enacted. Typical of these monopolies to the Indian citizens is that to the Karluk Indians here in question, about which the facts are undisputed.

A group of fifty families of Indians inhabit the village of Karluk. Their men were trappers and fishermen. How few trapped and fished is evidenced by the fact that in 1944 but 57 persons were eligible to vote to organize under the amended Wheeler-Howard Act, supra. Their men operated fish nets owned by the Alaska Packers Association in which they caught salmon by mooring one end of the net to a shore post and drawing the net across the salmon stream moving towards the Karluk

River and its upper spawning beds. They also fished for salmon from their own boats. Their catch was sold to the Alaska Packers' plant on the Karluk spit and to the appellee packers having plants elsewhere on Kodiak Island. They also were employed by the appellee canners on their boats, being paid, as the white fishermen, at so much per fish. In the non-fishing season they were employed by the local Alaska Packers' plant.

There is no evidence that the catch of the white fishermen in the waters sought to be reserved for the Indians in any way lessened the catch of the fifty Indian families or the wages they earned. It is fair to assume that since six hundred-odd white fishermen used these waters without interfering with each other, the 57 Indian fishermen would find no greater interference. Indeed, so far as their purchasing power is concerned, it well may be that it was much higher than before the white men established their plants on Kodiak Island.

To this Indian group the Secretary's instant Public Land Order 128 undisputably gave 35,000 acres, over 50 square miles, of upland "public lands" bordering on 15 miles of Shelikof Strait, the western boundary of Kodiak Island. The area of upland so reserved for the fifty families of the Karluk Indians is not questioned. The average for each family is over 700 acres, that is over four times the size of the homestead entry permitted to Indians in Alaska. 34 Stat. 197, 48 U.S.C.A. § 357.

The Secretary's order also purports to give a fishing monopoly of the entire area of the waters in which the salmon stream to the Karluk River may be caught. This fishing monopoly is created by treating as "public lands" of the United States an area below low water in Shelikof Strait 15 miles long by 3,000 feet wide. That is to say, 5,450 acres or over 8½ square miles covering the fishing area of the salmon run into the Karluk River spawning beds. From this reservation, if valid, the appellant's brief properly claims there are excluded from trespass in its area all the 450 white fishermen shown to be hitherto employed there by the appellees, plus, say, 150 more by the large Alaska Packers' plant on Karluk spit.

In the last season of 1946 the white fishermen of appellees caught 3,920,789 salmon in the purportedly monopolized area which were processed for the American food supply. To this must be added the large amount of the Alaska Packers. Appellees' capital investment in plant and equipment, dependent in large part on these salmon, is $2,075,000. Plus this is the capital investment of the Alaska Packers' Karluk plant. The value of the appellees' enterprises as going concerns is so large that it requires a pre-season expenditure of $1,515,000 and the employment as processors in the packing plants of appellees alone of 624 employees.

If this fishing monopoly exists, the Wheeler-Howard Act permits the sale to the white fishermen of rights to share in it. It is obvious that what the Karluk community monopoly could extract from these food producers for the right to employ its fishermen in these monopolized waters well could be more than enough to comfortably sustain these Indians without any fishing or trapping at all.

Here is not the President's but the withdrawing power of the Secretary of the Interior, a subordinate officer, which is in question and it is in connection with a statute which confers withdrawal power not in the general language of *"lands* of the United States" but only over "public lands." The phrase "public lands" has been confined to a limited class of lands through a long line of Supreme Court decisions which always have distinguished them from other lands of the United States, and which hold that "public lands" do not include the lands below low water mark of ocean waters. These cases require the determination whether the word "public" before the word "lands" gives the phrase "public lands" a specific meaning which does not include such ocean waters and whether Congress would have placed it there if it intended to include such waters, since by omitting the word "public" the word "lands" by itself would have included them. The applicable principle is that restated

from many prior decisions in Ex parte Public Bank, 278 U.S. 101, 104, 49 S. Ct. 43, 44, 73 L.Ed. 202:

"No rule of statutory construction has been more definitely stated or more often repeated than the cardinal rule that 'significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, § 2, it was said that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." ' "

The same in Washington Market Co. v. Hoffman, 101 U.S. 112, 115, 25 L.Ed. 782.

The principle so stated is always applicable. Here it is the more so in determining whether Congress intended to reverse its anti-monopoly legislation in Alaska fishing in an amendment to an Act in neither of which ocean waters or fishing are mentioned, and upon which nothing concerning ocean waters or fishing appears in the committee reports.

█ That the all inclusive word "lands" in a statute or a treaty providing for a reservation of "lands" for Indians includes such navigable waters, has been clearly established. In Alaska Pacific Fisheries v. United States, 248 U.S. 78, 79, 39 S.Ct. 40, 63 L.Ed. 138, it was held that under a Congressional statute specifically creating for the Metlakahtla Indians a reservation of "the body of *lands* known as Annette Islands, situate in Alexander Archipelago in southeastern Alaska" 48 U.S.C.A. § 358, included the fishing grounds in the adjacent navigable waters and upheld regulations implementing the legislation which gave an exclusive right of fishery to the Indians in an area extending 3,000 feet from the shore line.

So also where Congress enacted that the President should set apart as Indian reservations in California "four tracts of *land,* within the limits of said state," 13 Stat. 39, § 2, the President was empowered to include in a reservation of the land the bed of the Klamath River even assuming, which was contested, that the river was navigable. Donnelly v. United States, 228 U.S. 243, 260, 262, 33 S.Ct. 449, 57 L.Ed. 820, Ann. Cas. 1913E, 710.

This court held of the treaty of 1855 with the Quillayute Indians of which Article II provided for a reservation to them of "a tract or tracts of *land* sufficient for their wants within the Territory of Washington," 12 Stat. 971, that the treaty, so using the word "land," warranted a presidential reservation of the tide-lands on the ocean beach of the Quillayute River and of the navigable waters of that river for a distance of over a mile above its mouth. Moore v. United States, 9 Cir., 157 F.2d 760, certiorari denied 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. ——. So also we held of the word "lands" in the provision of the Act of 1884 that Alaska "Indians or other persons * * * shall not be disturbed in the possession of any *lands* actually in their use or occupation" that "lands" included "tidelands" so in use. Heckman v. Sutter, 9 Cir., 119 F. 83, 88.

Since the use of the word "lands" alone in Section 2 of the statute of 1936 would have given the Secretary of the Interior the power to reserve the ocean waters below low tide, we are required to give significance to the use by Congress of the word "public" before the word "lands" unless the phrase "public lands" has been determined to include lands of the United States in the ocean below low water mark.

No such decision is cited by appellant and our search has revealed none. On the contrary, the decisions unanimously hold the phrase "public lands" to have an established meaning excluding such waters.

On December 11, 1935, a few months before Congress placed the qualifying word "public" before the word "lands" in Section 2 of the Act of 1936, the Supreme Court decided the case of Borax, Ltd. v. Los Angeles, 296 U.S. 10, 17, 56 S.Ct. 23, 80 L.Ed. 9. There, in holding that because the jurisdiction of the Department of the Interior's Land Department extended in preemption claims only to "the *public* lands of the United States" that body could not render a final decision that preemption claimed lands were not tidelands, the Court states in 296 U.S. at page 17, 56 S. Ct. at page 27, 80 L.Ed. 9:

"Specifically, the term 'public lands' did not include tidelands. Mann v. Tacoma

Land Co., 153 U.S. 273, 284, 14 S.Ct. 820, 38 L.Ed. 714. 'The words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws.' 'Newhall v. Sanger, 92 U.S. 761, 763, 23 L.Ed. 769; Barker v. Harvey, 181 U.S. 481, 490, 21 S.Ct. 690, 45 L.Ed. 963; Union Pac. R. Co. v. Harris, 215 U.S. 386, 388, 30 S.Ct. 138, 54 L.Ed. 246."

This continued limiting construction of the phrase "public lands" as distinguished from the general word "lands" of the United States is thus seen to extend over sixty years' judicial consideration of our land laws.

In Mann v. Tacoma Land Co., 153 U.S. 273, 284, 14 S.Ct. 820, 822, 38 L.Ed. 714, Mann claimed title to certain tidelands in Commencement Bay in Puget Sound acquired by a location under script issued to one Valentine in lieu of lands claimed by him under a Mexican grant. This script was created by a special (not general) Act of Congress providing that Valentine or his succeeding holders of the script "may select, and shall be allowed, patents for an equal quantity of the unoccupied and unappropriated *public lands* of the United States." 17 Stat. 649, 650, § 3. In holding that tidelands were not included in the phrase "public lands" the Supreme Court states:

"There is nothing in the act authorizing the Valentine script, or in the circumstances which gave occasion for its passage, to make an exception to the general rule. It provided that the script might be located on the unoccupied and unappropriated public lands, but the term 'public lands' does not include tide lands. As said in Newhall v. Sanger, 92 U.S. 761, [763, 23 L.Ed. 769]: 'The words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws.' See also Leavenworth, etc., Railroad v. United States, 92 U.S. 733, [23 L.Ed. 634]; Doolan v. Carr, 125 U.S. 618, 8 S.Ct. 1228 [31 L.Ed. 844]."

The "general rule" referred to was that of Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331. Unlike the use of the phrase "public lands" in the special legislation creating the Valentine script, the phrase was used in the "general legislation" of September 27, 1850, 9 Stat. 496, providing for a donation claim of "public lands" which the Supreme Court held did not include lands below high water mark. That Act provided for a grant to "every white settler or occupant of the *public* lands, American half-breed Indians included," on certain conditions of occupancy and cultivation of the lands, of 320 acres if unmarried and an additional 320 acres to his wife if married to her before December 31, 1851. Despite this specific restriction of the legislation to the relatively few whites and half-breed Indians in Oregon in 1851, the Supreme Court states that the Oregon Donation Act is "general legislation" by which cannot be granted navigable waters adjoining such "public lands."

It is thus apparent that whether the Act of 1936 be regarded as general legislation for all the Indians in Alaska or special legislation for their benefit, the phrase "public lands" does not include ocean waters any more than in the special legislation for Valentine or the general legislation for the Oregon whites and half-breeds there in 1851. Nor is the rule of Shively v. Bowlby confined to legislation for *grants* of land. In the case of United States v. Holt Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465, its principle was applied in determining that a *reservation* of the Chippewa Indians surrounding navigable Mud Lake, whose area of 5,000 acres is comparable to the area of navigable waters here involved, did not include that lake.

This court in Heckman v. Sutter, 9 Cir., 128 F. 393, 394, 395, expressly distinguishes between the limited meaning of the phrase "public lands" as excluding ocean lands and distinguished that phrase from the phrase "any lands" of the Act of May 17, 1884, which it held included Alaska tidelands under the rule of Shively v. Bowlby, stating:

"Nor is it reasonable to suppose that Congress intended the broad and comprehensive terms thus used by it to be limited by the interpretation put upon the term 'public

lands' in the general land laws, which it expressly provided should not be in force in Alaska. * * *"

Despite the holding of the limiting meaning of the word "public" before the word "lands" in the Borax, Ltd. case, decided shortly before the Act of 1936, and our decision in Heckman v. Sutter, last cited, it is claimed that Congress intended that the latter Act must be construed as if the all-inclusive word "lands" alone were used. The argument is, in effect, that the coastal Indians of Alaska would be economically benefitted if the word "public" were absent and since the Wheeler-Howard Act contemplates an economic benefit to them we must construe it without that adjective.

Of course, it could not be contended that the *only* economic benefit Congress could have contemplated was a reservation of ocean waters, for here we have a reservation of fifty square miles of upland. So also does a reservation of upland bordering on fishing waters give to the Indians exclusive access to such waters from their shore, both for the launching of their boats and for the posts upon which are attached their nets held by boats across the streams of fish in the navigable waters.

That it would be a *further* economic benefit to create fishing monopolies in the Indians and thus destroy the established packing industries or compel them to pay tribute to them is also obvious, but for the reasons stated we think that Congress did not so intend when it used the phrase "public lands" in the 1936 amendment. The attempt of the Secretary, beginning in 1943, to create the several monopolies in ocean waters as part of "public lands" does not constitute an administrative interpretation overcoming the sixty years of contrary interpretation of the Supreme Court. There is no error in the holding of the district court that such attempted reservation of ocean waters in Public Order 128 is invalid.

In reaching this conclusion we have had in mind that the packing corporations, whose thousands of fishermen have so increased the world's food production, are not to be regarded as eleemosynary institutions. The American way of the profit motive often leaves unjustly behind minority groups of lesser education and initiative. That the Alaska Indians have suffered in the past under the competitive system is obvious. That statutes for their relief should be liberally construed in their favor is well established. Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138. What we have held is no more than that Congress did not intend to give such monopoly creating power to the Secretary of the Interior by the particular 1936 amendment to the Wheeler-Howard Act which does not concern the Alaska fisheries and in the consideration of which amendment the great food producers had no reason to participate and which could give no ground for their exclusion, from their established fishing grounds, except by a construction of its language contrary to the construction of over half a century.

II. *The White Act does not permit a monopoly of fishing in these Indian citizens as a conservation measure.*

There is no merit in the contention that, even assuming the ocean waters not reserved, regulation 208.23(r) is a valid method of conservation because, under the Secretary's direction, the licensees who share in the monopoly so may be limited that the balance between catch and reproduction of salmon is better maintained. The White Act gives the Secretary the wide discretion recognized in Dow v. Ickes, App.D.C., 123 F.2d 909, but it plainly says that in seeking conservation "no exclusive or several right of fishery shall be granted" in a regulated area—and here exclusive rights are given to the 57 Indians and their favored white licensees. Six hundred American fishermen will be "denied the right to * * * fish" which is given them wherever others are permitted under the White Act so to do.

Nor is there merit in the contention that this is a regulation giving a preference to resident as distinguished from non-resident fishermen held valid in many states. Here is boldly provided a sharing in the monopoly of a limited number of non-resident licensees, a purpose, the evidence shows, which was accomplished by the sale

to them by the Indians of permits for the season of 1946.

Likewise with appellant's contention that appellees cannot obtain relief because some of them actually fished under the Indian permits in the 1946 season. Obviously, under the wrongful threat of appellant to seize their boats during that season, they would pay the Indians their exaction rather than lose a large part of the pre-season expenditures of $1,515,000 which the district court found actually had been made. Action under such a threat cannot deprive appellees of the right to resist such threatened illegal action in succeeding seasons.

■ III. *The Secretary is not an indispensable party.* It thus appears that appellees are not to be excluded from fishing in the Karluk salmon run either by the Secretary's purported reservation of public lands under the Act of 1936 or by his purported conservation reservation of the Karluk fishing area under the White Act. In both cases the purported action was without any authority whatsoever. Since all power to act was absent, the Secretary was not merely abusing a discretion and hence required to be joined. The rule as stated for this circuit in Neher v. Harwood, 9 Cir., 1942, 128 F.2d 846, 849, 158 A.L.R. 1116; certiorari denied 317 U.S. 659, 63 S.Ct. 57, 87 L.Ed. 529, is:

"In the two former cases the superior officer had acted under a statute which was not attacked as unconstitutional, but it was contended that the superior had in some manner *abused his discretion* and in such circumstance it was held that he should be made a party to the action in order to defend his direction and regulations. Where he was *without authority to act at all* in the premises his actions assuming to authorize action by the subordinate were of no validity and left the subordinate as the actor subject to restraint." (Emphasis supplied.)

In that action, in 128 F.2d, at page 849, we described Colorado v. Toll, 268 U.S. 228, 45 S.Ct., 505, 69 L.Ed. 927, as a case in which the superior was not necessarily joined because "he had no statutory authority whatsoever to issue the regulations complained of." So similarly Berdie v. Kurtz, 9 Cir., 75 F.2d 898.

The rule is similarly stated for the Sixth Circuit that where plaintiffs "are challenging the statutory power of the Administrator to promulgate the regulations in question * * * the Administrator was not an indispensable party to the action and the court had jurisdiction to proceed against the Administrator's subordinates." Varney v. Warehime, 6 Cir., 147 F.2d 238, 243; certiorari denied 325 U.S. 882, 65 S.Ct. 1575, 89 L.Ed. 1997. See also in the Fourth Circuit, Ainsworth v. Barn Ballroom Co., 157 F.2d 97, and the Fifth Circuit, Yarnell v. Hillsborough Packing Co., 70 F.2d 435, 438, 92 A.L.R. 1475.

Appellant contends that injunctive relief must be denied under our decision in P. E. Harris Co. v. O'Malley, 9 Cir., 2 F.2d 810. That, however, was not a case where a regulation of the Secretary of Commerce was claimed to be invalid. The injunction there was sought to determine whether a particular salmon trap violated a regulation. In the instant case, the Secretary is held to have no authority to make the regulation the violation of which, if valid, would require the seizure and condemnation of the appellees' fishing boats and gear and the fine and imprisonment of their fishermen. The facts bring the case clearly within Philadelphia Co. v. Stimson, 223 U.S. 605, 621, 32 S.Ct. 340, 56 L.Ed. 570, where the contention was that the Secretary of War was without authority to make a regulation which, if valid, warranted prosecution for a misdemeanor, and it was held that if the regulation was invalid its enforcement could be enjoined. The doctrine is so restated in Stark v. Wickard, 321 U.S. 288, 290, 311, 64 S.Ct. 559, 88 L.Ed. 733, and in Board of Governors v. Agnew, 329 U.S. 441, 444, 67 S.Ct. 411, 91 L.Ed. ——. Cf. Freeman v. Smith, 9 Cir. 44 F.2d 703.

The decree of the district court is affirmed.